**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

-----------------------------------------------------------------x

RICKY HILL,                                            :
                                                      :     <u>JURY TRIAL DEMANDED</u>
     Plaintiff,                :
                                                      :     Case No.
    v.                               :
                                                      :     Hon.
AMB SPORTS & ENTERTAINMENT, LLC (d/b/a   :
Atlanta United FC); INTER MIAMI CF, LLC; LAS    :
VEGAS SOCCER LLC (d/b/a Las Vegas Lights FC);:
MAJOR LEAGUE SOCCER, LLC; MEMPHIS 901   :
FC LLC; PRODIGAL SOCCER, LLC (d/b/a OKC   :
Energy FC); TEPPER SPORTS & ENTERTAIN-    :
MENT (d/b/a Charlotte FC); UNITED SOCCER    :
LEAGUES, LLC,                                         :
                                                      :
     Defendants.               :
-----------------------------------------------------------------x

## <u>COMPLAINT</u>

  Plaintiff, Ricky Hill (at times, "Plaintiff" or "Hill"), by his undersigned counsel of record,

for his Complaint in this matter alleges as follows:

## I.  <u>NATURE OF THE CASE</u>

  1.  Ricky Hill is a Black man who has been discriminated against on the basis of race

and color, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq. ("Title

VII"), the Illinois Human Rights Act, 775 ILCS 5/101 et seq. (the "IHRA"), and the Civil Rights

Act of 1866, 42 U.S.C. §1981.

  2.  Hill is an internationally acclaimed soccer player, and highly successful and

decorated coach of professional men's soccer teams. During the past several years, he has applied

for coaching and technical positions at each of the US professional men's soccer clubs named as

defendants in this lawsuit.

3.      In every case, after receiving repeated inquiries from Hill or others on his behalf, each of these clubs hired one or more white or other non-Black candidates for those positions, each of whom was, at the time, objectively less qualified than Hill for the position. The clear disparity between Hill's qualifications and the white and other non-Black hires has at all times been well known to management, or could have been had they not rejected Hill out of hand before looking into his credentials.

4.      Despite Hill's requests for explanations as to why he has not been selected for any of the positions, which instead went to less qualified white and other non-Black applicants, none has ever been provided.

## II.      JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of the instant complaint pursuant to 28 U.S.C. § 1331 because the Plaintiff's claims arise under the laws of the United States. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this District pursuant to 28 U.S.C. §1391 because the unlawful employment practices and/or omissions were committed in whole or in part, in this District.

## III.      PARTIES

7.      Plaintiff, RICKY HILL, at all times material to the allegations in this Complaint, has been a citizen of England and permanent lawful resident of the United States, residing in Chicago, Illinois.

8.      Defendant, AMB SPORTS & ENTERTAINMENT, LLC (d/b/a Atlanta United FC), at all times material to the allegations in this Complaint, was the owner of a professional men's soccer team known as Atlanta United FC.

9.      Defendant INTER MIAMI CF, LLC, at all times material to the allegations in this Complaint, was the owner of a professional men's soccer team known as Inter Miami CF.

10.      Defendant LAS VEGAS SOCCER LLC (d/b/a Las Vegas Lights FC), at all times material to the allegations in this Complaint, was the owner of a professional men's soccer team known as Las Vegas Light FC.

11.      Defendant MEMPHIS 901 FC LLC, at all times material to the allegations in this Complaint, was the owner of a professional men's soccer team known as Memphis 901 FC.

12.      Defendant PRODIGAL SOCCER, LLC (d/b/a OKC Energy FC) at all times material to the allegations in this Complaint, was the owner of a professional men's soccer team known as OKC Energy FC.

13.      Defendant TEPPER SPORTS & ENTERTAINMENT (d/b/a Charlotte FC), at all times material to the allegations in this Complaint, was the owner of a professional men's soccer team known as Charlotte FC.

14.      Defendant MAJOR LEAGUE SOCCER, LLC ("MLS"), at all times material to the allegations in this Complaint, was a professional men's soccer league of which certain defendants, as identified herein, were member clubs.

15.      Defendant, UNITED SOCCER LEAGUES, LLC ("USL"), at all times material to the allegations in this Complaint, was a professional men's soccer league of which certain defendants, as identified herein, were member clubs.

## IV.      EXHAUSTION OF ADMINISTRATIVE REMEDIES

16.      Plaintiff filed timely charges of discrimination with the EEOC in October and November of 2021. Upon Plaintiff's request, the EEOC issued a Notice of Right to Sue with respect to each of the named defendants, copies of which are attached hereto as Exhibit A.

17.     Plaintiff is filing this lawsuit within 90 days of receiving the attached notices.

## V.      FACTS COMMON TO ALL COUNTS

### A.     Examples of Ricky Hill's Career Achievements

18.     Ricky Hill was an elite level football player in England from 1976 to 1989, which included playing on the England national football team (representing England in international competition) from 1982 to 1986.

19.     In 1992, as a player-coach for the Tampa Bay Rowdies in the American Professional Soccer League, which was then the premier U.S. professional soccer league, Hill led his team to two national finals and, among other awards, was voted the league's coach of the year and was a first team all-star.

20.     In 1994, Hill was the Technical Director of the Cocoa Expos in the United States Interregional Soccer League, the premier U.S. professional soccer league at that time. He led that team to a divisional title and an appearance in the national championship, finishing as runner up in the 72-team nationwide league.

21.     From 1996 through 1999, Hill was the Premier League club Sheffield Wednesday Academy U19 development head coach, charged with the future development of U18 players assisting to elevate them into the first team. The Premier League is the top professional football league in the world.

22.     In 2003, Hill was appointed Technical Director and head coach of San Juan Jabloteh in the Trinidad and Tobago Professional Football League. He led the club to unprecedented success, winning four out of a possible five competition trophies, including the prestigious Caribbean Football Union, signifying the best professional club team in the Caribbean, and qualifying for the Concacaf Champions League (the top-level club knockout competition in

the Concacaf region.) The San Juan team's success resulted in Hill winning his second professional coach of the year award for 2003-2004.

23.     During Hill's tenure with San Juan Jabloteh, 13 players from the team represented the Trinidad and Tobago national team, which qualified for the 2006 World Cup Finals in Germany, for the only time in the country's history.

24.     In 2012, as head coach of the Tampa Bay Rowdies, then of the North American Soccer League ("NASL"), which was known as the second division of U.S. Soccer, with Major League Soccer ("MLS") being the first, Hill led his team to a national championship which was the franchise's first in 27 years. Hill received his third professional coach of the year award from the NASL (his second within US professional soccer).

25.     As coach of the Tampa Bay Rowdies. Hill amassed a 53% winning record, which was the second highest winning percentage in the NASL's modern history.

26.     Subsequent to Hill's departure from NASL in 2014, four coaches from that league have been elevated to the MLS, none of whom achieved the degree of success that Hill had with the Tampa Bay Rowdies.

**B.     Atlanta United FC Declines Hill's Applications, Hiring Non-Black and White Candidates Instead.**

27.     Atlanta United began play as an MLS expansion team in 2017, having been founded in 2014.  It was the first Atlanta-based MLS franchise, and plays its home games at the Mercedes-Benz Stadium, which it shares with the city's NFL franchise, the Atlanta Falcons. Both are owned by Arthur Blank, co-founder of The Home Depot.

28.     Hill began reaching out to Atlanta United in late 2014, having obtained contact information for its then President, Darren Eales. At that time, Hill exchanged messages with Mr.

Eales and during those interactions expressed his interest in employment with the Atlanta United organization.

29.     Hill met with Eales in Atlanta in March of 2015, at which time there were open positions in the area of technical staffing, for which Hill was qualified and sought employment.

30.     In April of 2015 Atlanta United announced the hiring of Carlos Bocanegra for the position of Technical Director. Bocanegra is non-Black, with a distinguished career as a soccer player, playing primarily outside the USA, in England and Scotland in particular.

31.     At the time he was hired by Atlanta United, Bocanegra had acquired no prior coaching or managerial experience in the technical development area at any professional soccer organization, within or outside of the USA.

32.     On or about February 1, 2017, Mr. Patrick Dicks, who was a senior business development manager at Disney Sports in Orlando, Florida, sent an email to Eales to inform him that Hill was looking for work, and was open to coaching the Atlanta United reserve team (Atlanta United 2). No response was ever received from Atlanta United, either by Dicks or Hill.

33.     The position of Head Coach of the Atlanta United 2 team was held by Mr. Stephen Glass (a white, former Scottish international player), from 2017 through 2020, after which he left in March of 2021, with no winning seasons.

34.     Hill's representative, Kieren Keane, attempted to make contact with Eales by phone on March 25, 2021, while Eales was President and CEO of Atlanta United. Keane left a voicemail message expressing Hill's interest in the vacant Atlanta United 2 head coaching position. Keane also sent Eales a text message requesting a suitable time to connect with him regarding Hill's interest.

35.     After following up several times, Keane received an email from Eales' assistant, Patricia Johnson, on April 5, 2021, stating in part that, "Unfortunately due to the high volume of applicants, we are unable to provide individual updates on applicant status, but we will be in touch should there be any interest."

36.     Keane replied to Johnson by email on April 7, 2021, stating, in substance, that Hill's resume far exceeded those of the two previous incumbents in the Atlanta United 2 head coach (Stephen Glass) and Academy Director (Tony Annan) roles, and inquiring as to why Hill would not be a candidate of interest, or even worthy of an interview.

37.     In late April of 2021, Eales informed Hill that Bocanegra was conducting the recruitment process for both of the aforementioned open positions.

38.     Hill asked Eales whether consideration would be given to all candidates, including those not already within the organization. Eales replied only that the positions were open and not presently internally filled and that Bocanegra would be in touch "shortly."

39.     After three weeks with no further contact from Atlanta United, on or about May 12, 2021, Keane wrote to Eales and Bocanegra asking why neither he nor Hill had heard back from anyone, and whether the positions remained open.

40.     Later that day, Felipe Villahoz, Operations Coordinator, VP & Technical Director's Office of Atlanta United, contacted Hill asking if he would participate in a virtual (Zoom) interview the following week.

41.     On May 19, 2021, Hill was interviewed via Zoom for about forty (40) minutes with Bocanegra, Villahoz and Johnathon Spector, Head of International Recruitment and Development for Atlanta United.

42.     On May 28, 2021, Hill received a phone call in the evening from Bocanegra, who informed Hill that he would be promoting Jack Collison to the Atlanta United head coach position. Collison is a white, relatively inexperienced soccer coach, who was then working at an Academy position for Atlanta United.

43.     Bocanegra also explained during that phone call that he would be promoting Matt Lawrey -- who, like Collison, is also a white, relatively inexperienced soccer coach -- from his Academy Assistant Director's job to Academy Director for Atlanta United.

44.     Both of these white hires, chosen over Hill, had far less experience and success as professional soccer coaches and/or technical directors than Hill. In fact, neither Collison nor Lawrey has ever coached men's senior (as opposed to youth) soccer.

45.     Lawrey was then 32 years old, and had been in his Academy Assistant's role for the five previous years. Collison was then 33 years old, and had worked in the Academy as a coach since 2019 after leaving West Ham United's U16 team, where he was manager since 2017.

## C.     Inter Miami CF Declines Hill's Applications, Hiring Non-Black and White Candidates Instead.

46.     On January 29, 2018, four years after an investor group assembled by David Beckham (the Miami Beckham United group) announced their goal of launching a Miami professional soccer team, the twenty-fifth MLS franchise, Inter Miami CF, announced it was set to launch in the 2020 season.

47.     With many Academy and senior professional coaching and technical director positions open at the not-yet-operational club, on November 7, 2019, Hill expressed an interest in applying for one of these open positions. He communicated his interest via WhatsApp message to David Gardner, who Hill knew to be a close friend and associate of Inter Miami's owner, David Beckham.

48.     Gardner responded that he had passed Hill's details along to Inter Miami's Sporting Director and COO, Paul McDonough, and stating "that [Mr. McDonough] is going through all applicants at the moment."

49.     Despite several follow-up attempts by Hill during November of 2019, both with Beckham's personal assistant (Sophie Clark) and Gardner, Hill never received any response at all, much less any outreach that might lead to his consideration for any coaching or technical position with the newly formed franchise.

50.     During his interactions with Gardner and Clark, Hill had informed each of them that he wished to be considered for employment in any coaching capacity in which the organization had availability.

51.     Inter Miami filled their technical staff with the following personnel:

Head Coach: Diego Alonso – a non-Black, experienced professional soccer coach;

Assistant Coach: Claudio Arzeno – a non-Black, former player who played in Argentina, with no known professional coaching experience, resume or references;

Assistant Coach: Mauricio Marchetti – a white, long-time assistant to Coach Alonso; and

Assistant Coach: Anthony Pulis – a white, former player who had previously served without success as a head coach at both Orlando City B (USL) and St. Louis FC (USL).

52.     In January of 2020, Darren Powell, a white, British coach, was appointed Director of Player Development at Inter Miami and also as Assistant Coach of the Inter Miami second team, Fort Lauderdale CF.

53.     Inter Miami's first MLS game was played on March 1, 2020.

54.     Hill's qualifications for the open positions – his overall experience and record of accomplishments as both a professional soccer player and coach – were at all relevant times objectively superior to those of Pulis, Powell, Arzeno and Marchetti.

55.     Pulis had no identifiable record of success in his professional soccer head coaching positions.

56.     Powell's primary professional experience was as Director of Orlando's Academy while Orlando was in the USL, and later as a head coach for San Antonio FC in the USL in 2016.

57.     The USL was then a league that was deemed below the standards of the NASL (North American Soccer League), in which I served as the head coach and technical director for the Tampa Bay Rowdies from 2011through 2014.

58.     On March 16, 2021, Inter Miami announced that Powell had been promoted internally by McDonough to Head Coach at Fort Lauderdale CF, and retained his position as Director of Player Development.

59.     Pulis and Powell's appointments again display the perpetuation by clubs in the USL and MLS of a pattern and practice of hiring and promoting from within, and otherwise adhering to cultural, ethnic and/or racial preferences, which, intentionally or otherwise, historically largely (if not totally) exclude Blacks from upper-level coaching and technical staffing positions.

60.     On April 19, 2021, Keane again reached out on behalf of Hill, this time to Inter Miami's new Chief Soccer Officer and Sporting Director, Chris Henderson, regarding the recently vacated position of Academy Director. Jason Kreis, who is white, and who had held that position, was elevated to assistant coach of Inter Miami's first team.

61.     On April 20, 2021, Henderson advised Keane to "please send to Mark Prizant" (Director of Scouting at Inter Miami). On April 22, 2021, Keane forwarded an email copying both

Henderson and Prizant, expressing Hill's interest in the vacant Academy Director's position and attaching his resume for their attention.

62.     Keane followed up again on April 28, 2021, and May 17, 2021, but received no response from either Henderson or Prizant.

63.     On May 26, 2021, Keane wrote to Henderson for the fifth time and Prizant for the fourth time, asking again whether the Academy Director position was still open and for Hill's resume to be considered.

64.     This time, Keane received a response from Prizant stating, "Kieren –Thanks for reaching out. Unfortunately, the position is no longer open. We will keep his CV on file."

65.     On May 27, 2021, Keane replied to Prizant, asking, "So I can best serve Hill going forward, would you mind letting us know the date the position was filled, and any constructive advice we can give him about why he wasn't considered for the job?"

66.     To date, there has been no response to Keane's last email.

67.     On June 17, 2021, Inter Miami announced that the Academy Director position was filled by Craig Dalrymple, a white, British coach with no professional playing career, no senior men's professional coaching career and limited Premiership environment youth team experience.

68.     Dalrymple was the U14 and U15 Head Coach at Portsmouth FC (not a full-time position) for less than a year, from August of 2009 to April of 2010. During the next approximately ten years he was employed by Vancouver Whitecaps FC, and the highest head coach position he held was as a U23 (non-senior club) head coach.

69.     Hill's qualifications for the open position – his overall experience and record of accomplishments as both a professional soccer player and coach – were at all relevant times objectively superior to those of Dalrymple.

**D.     Las Vegas Lights FC Declines Hill's Applications, Hiring Non-Black and White Candidates Instead.**

70.     In March of 2018, Las Vegas Lights FC was a newly created soccer franchise that was about to begin their inaugural season in the USL.

71.     The franchise was owned by Brett Lashbrook, who was also the club's general manager.

72.     In September of 2017, knowing that Las Vegas Lights was preparing for play in the USL, Hill asked his close friend Matt Clark to reach out to the club on his behalf and express Hill's desire to be considered for the head coach position. To that end, Clark sent Lashbrook an email on September 17, 2017, to which there was no response.

73.     Las Vegas Lights instead hired José Luis Juan Sánchez Solá (p/k/a "Chelis"), a non-Black former MLS and Mexican XL head coach and technical director, on November 17, 2017.

74.     Chelis was relieved of his duties in September of 2018, after earning a losing record and missing 12 matches due to a suspension due to inappropriate conduct involving an official.

75.     Chelis' son and assistant coach, Isidro Sánchez, took over for the remainder of the inaugural season until his firing in October 2018.

76.     Meanwhile, Matt Clark had been following up on Hill's behalf, emailing Lashbrook in August and again in September of 2018, after not hearing from Lashbrook after his previous attempts.

77.     Lashbrook had not responded by the time he announced his next hire for head coach and technical director on October 17, 2018, who was Eric Wynalda, a white, former US and international player who began coaching in 2012.

78.    Hill's qualifications for the open position – his overall experience and record of accomplishments as both a professional soccer player and coach – were at all relevant times objectively superior to those of Wynalda.

79.    Although a fine player, Wynalda has nowhere near the experience or success as a coach in comparison to Hill's professional history.

80.    Wynalda was nonetheless appointed as head coach of Las Vegas Lights without even responding to Hill, granting Hill an interview or apparently even considering Hill for the job – preferring instead a white, ex-player with limited coaching experience.

81.    Wynalda improved the Las Vegas Lights' record, but did not earn them a playoff spot. On June 17, 2020, Wynalda was fired by the Lights for an undisclosed violation of league rules during the USL's preparations to resume play amid the COVID-19 pandemic.

82.    The position was filled by Frank Yallop, a white, British-Canadian former professional soccer player and coach, for a short-term post during the remainder of the 2020 season.

83.    Upon Wynalda's departure, Lashbrook made this declaration on June 19, 2020, in the Las Vegas Review Journal article, written by Ben Gotz: "Clearly, having four coaches in three seasons is not the model, the blueprint or the business plan that I've laid out. . .. I need to make sure that I do a better job to make sure this doesn't happen."

84.    In December of 2020 with the position of head coach and technical director at the Las Vegas Lights once again being vacant, Hill personally attempted to make contact with Lashbrook via telephone calls to his cell phone. Lashbrook never responded.

85.    On January 25, 2021, Keane, on behalf of Hill, visited Las Vegas and sent emails, texts, and voicemails to Lashbrook, asking for an opportunity to meet with him and discuss Hill's

potential consideration for the then-open head coach and technical director position at the Las Vegas Lights.

86.     Lashbrook again failed to respond, and Hill was again passed over for the opportunity without explanation.

87.     On March 10, 2021, Steve Cherundolo was appointed as the head coach for the Las Vegas Lights. Cherundolo is a white, former US and international player with limited coaching experience, serving predominantly as an assistant coach since 2014.

88.     On March 12, 2021, Las Vegas Lights announced a partnership with Los Angeles FC, of the MLS. Under the one-year partnership, the Las Vegas Lights FC became the USL affiliate of Los Angeles FC, and shared technical staff including the new head coach, Cherundolo.

89.     Cherundolo's appointment again displays the perpetuation by clubs in the USL and MLS of a pattern and practice of hiring and promoting from within, and otherwise adhering to cultural, ethnic and/or racial preferences, which, intentionally or otherwise, historically largely (if not totally) exclude Blacks from upper-level coaching and technical staffing positions.

**D.     Memphis 901 FC Declines Hill's Applications, Hiring White Candidates Instead.**

90.     Memphis 901 FC was founded in 2018 and began playing in the USL in 2019.

91.     Keane, on behalf of Hill, emailed the club's owner and general manager, Craig Unger, on March 5, 2018, to have Hill considered for the then-open head coach position at Memphis 901.

92.     Unger did not respond.

93.     On August 15, 2018, Memphis 901 announced that Tim Mulqueen was appointed as head coach of their franchise.

94.     Mulqueen had been a goalkeeper coach on many occasions, including for the United States National Team at the 2004 Summer Olympics qualifying tournament, and several youth (non-senior) teams. Mulqueen also was an assistant coach of the 1995 Lafayette College Men's Soccer team, which made it to the NCAA Division I Tournament sweet 16.

95.     Mulqueen's appointment was his first head coach position. and in part due to his previous relationship with Memphis 901 Sporting Director, Tim Howard, the former USA International and Manchester United goalkeeper.

96.     Mulqueen's Wikipedia page states, "U.S. goalkeeper Tim Howard credits Mulqueen with helping to establish his own career. Mulqueen spent countless nights training Howard, and waived fees so that Howard could get more experience from the age of 12."

97.     Mulqueen having the opportunity to coach a marquee player like Tim Howard thus undoubtedly contributed to his ability to land a head coaching job in a top-level US professional soccer league.

98.     Hill, being denied such opportunities repeatedly, was again ignored by Memphis 901.

99.     Mulqueen was relieved of his duties on or about September 15, 2020, with Howard saying, "The results just haven't been good enough, simple as that. We need freshening up."

100.    That same day, Memphis 901 appointed then-assistant coach Ben Pirmann, who is white, as the interim head coach. As for the team's ongoing search for a head coach, Howard was quoted in the press that same day, "We want to bring someone in who has a reputation of winning. That's what our fans expect. . .. We'll leave no stone unturned trying to find the right manager to be our next Head Coach."

101.    Keane on behalf of Hill reached out again to Howard and his assistant Sporting Director James Roeling, on or about January 28, 2021, again seeking consideration for the open head coach position. After not receiving a reply, Keane reached out again on or about February 5, 2021 for the same purpose.

102.    Roeling later replied to Keane, "Thanks for reaching out. We are in the final stages of the process for interviewing head coaches so we aren't looking at any other applicants at this point unfortunately. We will keep you in mind in the future and let you know if anything changes."

103.    Memphis 901 eventually filled the vacant head coach position on or about April 8, 2021, by promoting interim head coach Ben Pirmann to permanent head coach. This decision was taken a full eight weeks after Roeling claimed to Keane that the club was in the "final stages" of their interviewing process.

104.    Hill's qualifications for the open position – his overall experience and record of accomplishments as both a professional soccer player and coach – were at all relevant times objectively superior to those of Pirrman.

105.    Pirrman's experience is not comparable to Hill's in terms of length of experience of the level of professional success or achievement. Hill's background is of a much higher caliber.

106.    Pirrman's appointment again displays the perpetuation by clubs in the USL and MLS of a pattern and practice of hiring and promoting from within, and otherwise adhering to cultural, ethnic and/or racial preferences, which, intentionally or otherwise, historically largely (if not totally) exclude Blacks from upper-level coaching and technical staffing positions.

**E.    OKC Energy FC Declines Hill's Applications, Hiring White Candidates Instead.**

107.    OKC Energy was founded in 2013, and began playing in the USL in 2014.

108.    OKC's first head coach, Jimmy Nielsen, is a white, former standout goalkeeper for Sporting Kansas City of the MLS, who had no prior experience as a head coach, or any other professional coaching position.

109.    Nielsen left OKC Energy at the end of the 2017 season, and was replaced by Steve Cooke, who was a white English national who had been an assistant coach at various organizations within the MLS, but never a head coach.

110.    Cooke also had no professional, elite-level playing experience, and limited experience working as a professional coach in the UK. Cooke left OKC Energy on or about October 22, 2019, after two seasons.

111.    Nielsen and Cooke, despite lacking any real success of note (*i.e.*, no conference championship or USL championship), both managed to procure further employment opportunities in US men's professional soccer. Nielsen rose to head coach at Hartford Athletic FC in the USL in 2019, and Cooke was appointed Director of Soccer for Phoenix Rising FC (USL) a mere six weeks after leaving OKC. Since that time Cooke was hired by the Seattle Sounders MLS franchise as their Head of Academy in May of 2021.

112.    These are but two of many, recurring instances of unsuccessful white coaches being promoted and re-entering the USL and MLS arenas after less than stellar performances.

113.    In contrast, Hill, a successful Black player and coach for over four decades has rarely been given so much as a return communication from MLS and USL teams, much less an interview or job offer.

114.    Keane, on behalf of Hill, attempted to make contact with the OKC Energy's general manager Jason Hawkins on or about April 8, 2019, to express Hill's interest in becoming their head coach.

115.    Hawkins did not respond.

116.    Again, prior to the position being filled, Keane tried to reach Hawkins again on or about October 22, 2019, and November 12, 2019, by phone and email.

117.    Again, there was no response from Hawkins.

118.    On or about November 22, 2019, OKC Energy announced the appointment of John Pascarella as their new head coach.

119.    Pascarella, who is white, had been a goalkeeping and assistant coach for the Kansas City Wizards in 2009, before the club became Sporting Kansas City, the name under which they now operate in the MLS.

120.    OKC Energy provided Pascarella with his very first professional head coaching position.

121.    The announcement of Pascarella as head coach, ten days after Keane's most recent attempts on Hill's behalf, without so much as a word in advance, felt extremely egregious and painful to Hill. Indeed, Hill has felt similarly every time one of the MLS or USL teams has followed essentially the same script: ignoring Hill and his standout credentials while hiring a white or other non-Black candidate with far less, if any, experience or success than Hill.

122.    Hill has nothing personal against Pascarella, but even an assessment by the most biased (against Hill) individual could not honestly compare Pascarella favorably to Hill.

123.    After Pascarella left the head coach position on or about June 4, 2021, Keane on behalf of Hill emailed Hawkins (still general manager of OKC) that day, and again on June 7, 2021, having received no response the first time.

124.    Then Keane emailed Hawkins again on June 11, 2021, this time copying his counsel on the email, again asking whether the head coach position was still open, and whether there might be a good time to discuss Hill's credentials and suitability.

125.    Hawkins replied within about two hours, saying, "The position is still open and under consideration. I have forwarded his information on to our COO."

126.    No further consideration of Hill has materialized at OKC Energy to date.

127.    In June of 2021, the OKC Energy appointed former assistant coach, Leigh Veidman, as interim head coach. The club made him the permanent head coach on October 28, 2021.

128.    Hill's qualifications for the open position – his overall experience and record of accomplishments as both a professional soccer player and coach – were at all relevant times objectively superior to those of Veidman.

129.    Veidman's experience is not comparable to Hill's in terms of length of experience of the level of professional success or achievement. Hill's background is of a much higher caliber.

130.    Veidman's appointment again displays the perpetuation by clubs in the USL and MLS of a pattern and practice of hiring and promoting from within, and otherwise adhering to cultural, ethnic and/or racial preferences, which, intentionally or otherwise, historically largely (if not totally) exclude Blacks from upper-level coaching and technical staffing positions.

**E.    Charlotte FC Declines Hill's Applications, Hiring White Candidates Instead.**

131.    Charlotte FC began competing in the MLS during the 2022 season. The team is owned by David Tepper since its inception as an MLS franchise in December of 2019.

132.    Charlotte plays at Bank of America Stadium, which it shares with the Carolina Panthers of the National Football League, a team also owned by Tepper.

133.   Keane, on behalf of Hill, contacted numerous persons within the Charlotte organization by email during June and July of 2021, in an effort to have Hill's resume reviewed and considered for the then-vacant head coach position.

134.   Keane contacted Nick Kelly (President), Zoran Krneta (Sporting Director) and Marc Nicholls (Technical Director) at various times, individually, and provided Hill's resume to each for consideration.

135.   To date, there has never been any contact or acknowledgement of Hill's interest in employment with Charlotte.

136.   On or about July 7, 2021, Charlotte hired Miguel Angel Ramirez for the head coach position.

137.   Ramirez, who is white, of Spanish ancestry, had no professional playing career, and only recent senior professional head coaching experience. The majority of his coaching experience prior to being hired by Charlotte was working with youth teams in various countries.

138.   About hiring Ramirez, Tepper was quoted in the press as saying, "We had a long search process. . .. When we talked to Miguel and got done with the Zoom call, I said I'm done. We're going to get this guy. This guy had a process, a clear thought of what he wanted. History of developing young talent, knows how he wants to play the game."

139.   That glowing endorsement could have equally described Hill's demonstrated goals and abilities as a coach, which he had actually been demonstrating for the past three decades. Had Tepper actually considered Hill for the job, he would have found exactly those criteria met – and actually demonstrated, rather than simply stated aspirationally.

140.     Hill's qualifications for the open position – his overall experience and record of accomplishments as both a professional soccer player and coach – were at all relevant times objectively superior to those of Ramirez.

141.     Ramirez' appointment again displays the perpetuation by clubs in the USL and MLS of a pattern and practice of, if not hiring and promoting from within, otherwise adhering to cultural, ethnic and/or racial preferences, which, intentionally or otherwise, historically exclude Blacks from upper-level coaching and technical staffing positions.

**F.     Blacks Are Severely Underrepresented in Coaching Positions in the MLS and USL.**

142.     As noted by the New York Times at the end of 2020, "Although all people of color in MLS are underrepresented at leadership levels, the discrepancy is most extreme for Black players." *Gillian R. Brassil and Eleanor Lutz*, In 30 Years, Little Progress for U.S. Sports Leagues on Leadership Diversity, New York Times, December 23, 2020, (https://www.nytimes.com/interactive/2020/12/23/sports/diversity-coaches-sports.html.)

143.     Indeed, the number of Black head coaches since 2014 in the first two tiers of the United States soccer league system – respectively, MLS (currently 28 teams, 3 with a Black head coach) and USL Championship (currently 27 teams, 1 with a Black head coach) – is severely lacking compared to the number of their white and non-Black counterparts.

144.     The racial disparity is even more pronounced given the myriad opportunities for appointments to head coach positions across the two leagues combined during the nine years, few of which have gone to a Black candidate, if one was even considered:[1]

MLS: 5 Black head coaches, 1 Black interim coach:

---

[1] While Plaintiff hopes to obtain verified information through discovery, it appears that that the total number of coaches hired during the respective time frames is approximately101 in the MLS and approximately 72 in the USL.

CF MONTREAL: Wilfred Nancy 2021-Present (head coach), Thierry Henry 2020 (head coach);
CHICAGO FIRE FC: Ezra Hendrickson 2020-Present (head coach);
COLORADO RAPIDS SC: Robin Fraser 2019-Present (head coach);
NEW YORK CITY FC: Patrick Vieira 2016-2018 (head coach);

FC CINCINNATI: Tyrone Marshall 2021 (interim coach)

USL: 4 Black head coaches:

OAKLAND ROOTS SC: Jordan Ferrell 2020-2021
HARTFORD ATHLETIC FC: Radhi Jeidi 2019-2020
FC TULSA: Michael Nsien 2018-Present
RIO GRANDE VALLEY FC: Gerson Echeverry 2017-2020

## G.   The MLS and USL are Equally Responsible for the Discriminatory Effect of its Member Clubs' Hiring Practices.

145.   The MLS has admitted that it has a league-wide problem with racism and, in particular, embedded practices that exclude Blacks from high level coaching and technical provisions.

146.   For example, on its website, an article dated Monday, Oct 19, 2020, 11:20 a.m. (see https://www.mlssoccer.com/news/major-league-soccer-unveils-steps-combat-racism-and-increase-black-representation), states, in part:

Major League Soccer unveiled a series of initiatives on Monday aimed at combatting racism, advocating for social justice and increasing Black representation in the sport.

The new programs, which include the formation of a Diversity Committee consisting of members of the MLS Board of Governors, MLS Commissioner Don Garber, representatives of the Black Players for Change (BPC) and other members of the soccer community, are the result of several months of discussions with key parties across the league, including a recent meeting between the MLS Board and the BPC.

"Major League Soccer is committed to utilizing our wide-ranging platforms to create meaningful programs to address racism and social injustice in society and in the sport of soccer," said MLS Commissioner Don Garber in Monday's announcement. "Importantly, alongside key stakeholders, including MLS owners, Black Players for Change, former players, Black

members of our technical staff and other employees, we have created a series of initiatives to close the representation gap across soccer in the U.S. and Canada."

147.   The MLS clearly has the ability to make anti-discrimination policies, including those governing the hiring of people of color, that are legally binding on its member clubs, as it vowed to do in the above referenced press-release.

148.   Unfortunately, as far as Ricky Hill is concerned, the MLS has failed to make good on its "commitment" to increasing social justice in US professional men's soccer.

149.   Similarly, more recently, the USL has made a similar pledge to bring its member clubs into line with acceptable anti-discrimination policies and practices. (See https://www.uslsoccer.com/united-against-racism).   Among   the   deficiencies   the   USL acknowledges need to be addressed are:

> 1. REALIZE and ACKNOWLEDGE that there is a lack of BlPOC representation within strategic decision making positions. Make a commitment to change.
> 2. PROVIDE training and education for all USL players, USL HQ employees, USL club ownership, front office staff, and technical staff.
> 3. PARTNER and CONSULT with other likeminded organizations to continue to enhance visibility, as well as furthering educational opportunities and resources for our League, Clubs and players.
> 4. IDENTIFY opportunities to promote, impact and celebrate local BIPOC-owned businesses.
> 5. SERVE as a platform to help educate our community about all forms of racism and anti-racist behaviors.
> 6. PROVIDE and ENCOURAGE opportunities for players to speak out against societal injustices.
> 7. INVEST time, energy, and other resources into our communities with an emphasis on benefiting BIPOC communities.
> 8. IDENTIFY opportunities to bring the Black community closer to the sport of soccer and highlight the intersection of soccer and Black culture.

150.   Moreover, the teams in the MLS and USL operate generally under the auspices, stewardship and governance of their respective leagues.

151.    The MLS and USL, on information and belief, are aware of internationally-acclaimed applicants for the head coaching positions of their member teams, such as Ricky Hill. They are also certainly aware of the identities of the head coaches ultimately appointed by those teams.

152.    Nonetheless, at least during the relevant times herein, while Hill has been seeking to be hired by the clubs identified herein, neither the MLS or the USL, on information and belief, had a policy in place to ensure compliance with federal anti-discrimination law in the hiring of its head coaches.

153.    The MLS and USL have thereby given their tacit, if not explicit, authorization and approval of the discriminatory acts alleged herein.

## V. COUNTS

**COUNT 1:**  Discrimination on the Basis of Race and/or Color in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), against all Defendants.

154.    Plaintiff repeats and realleges paragraphs 18 - 153 as if fully set forth herein.

155.    Each defendant is an employer within the meaning and coverage of Title VII.

156.    By their conduct as alleged herein, Defendants have violated Title VII by engaging in prohibited employer practices, including failing or refusing to hire an individual, Ricky Hill, and otherwise discriminating against him because of his race and/or color.

157.    In addition, Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy discriminatory conduct due to race and/or color. Each Defendant has actually participated in and aided and abetted the discriminatory conduct of the other Defendants.

158.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which he is entitled to an award of damages.

159.     Defendants' unlawful discriminatory actions constitute reckless, intentional, malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

**COUNT 2:**     Discrimination on the Basis of Race and/or Color in Violation of the Illinois Human Rights Act, 775 ILCS 5/101 et seq. (the "IHRA") Against All Defendants

160.     Plaintiff repeats and realleges paragraphs 18 -159 as if fully set forth herein.

161.     Each defendant is an employer within the meaning and coverage of the IHRA.

162.     By their conduct as alleged herein, Defendants have violated the IHRA by engaging in prohibited employer practices, including failing or refusing to hire an individual, Ricky Hill, and otherwise discriminating against him because of his race and/or color.

163.     In addition, Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy discriminatory conduct due to race and/or color. Each Defendant has actually participated in and aided and abetted the discriminatory conduct of the other Defendants.

164.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the IHRA, Plaintiff has suffered, and continues to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which he is entitled to an award of damages.

165.     Defendants' unlawful discriminatory actions constitute reckless, intentional, malicious, willful and wanton violations of the IHRA for which Plaintiff is entitled to an award of punitive damages.

**COUNT 3:**    Discrimination in Violation of 42 U.S.C. §1981 ("Section 1981") Against All Defendants

166.    Plaintiff restates and realleges the allegations of paragraphs 18-165 as if fully set forth herein.

167.    By their above-described acts and omissions, including declining to hire Plaintiff for the positions identified hereinabove, and by hiring, instead, less qualified white or other non-Black candidates, Defendants have subjected Plaintiff to discrimination and thwarted Plaintiff's contract opportunities and equal enjoyment of the rights, privileges and benefits enjoyed by white citizens based on, and because of, his race and ethnicity in violation of Section1981.

168.    Defendants have demonstrated repeatedly a preference for demonstrably less qualified white candidates over Plaintiff, who is Black, because Plaintiff is Black.

169.    In addition, Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy discriminatory conduct due to race and/or color. Each Defendant has actually participated in and aided and abetted the discriminatory conduct of the other Defendants.

170.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which he is entitled to an award of damages.

171.    Defendants' unlawful discriminatory actions constitute reckless, intentional, malicious, willful and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that the Court enters judgment in his favor and against the

Defendants for the following relief:

A.     A declaratory judgment that the actions, conduct and practices of the Defendants complained of herein violate the laws of the United States and the State of Illinois;

B.     An award of injunctive relief necessary to cure Defendants' discriminatory policies and practices;

C.     An award of damages to Plaintiff against the Defendants, in an amount to be determined at trial, to compensate them for all monetary and/or economic damages;

D.     An award of damages to Plaintiff against the Defendants, in an amount to be determined at trial, to compensate them for all non-monetary and/or compensatory damages, including, but not limited to, loss of reputation, loss of opportunity and mental anguish;

E.     An award of punitive damages to Plaintiff against the Defendants in an amount to be determined at trial;

F.     Pre- and post-judgment interest on all amounts due;

G.     An award of Plaintiff's reasonable attorneys' fees and costs; and

I.     Such other and further relief as the Court may deem just and proper.

**<u>PLAINTIFF DEMANDS A TRIAL BY JURY</u>**

Respectfully submitted,

RICKY HILL

By:     /s/Steven M. Shebar
(One of his Attorneys)

SHEBAR LAW FIRM
Steven M. Shebar
0N370 Fanchon St.
Wheaton, Illinois 60187
(630) 877-6833
steveshebar@shebarlaw.com
*Attorneys for Plaintiff Ricky Hill*

27