**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------x
RICKY HILL,                            :

                                     :

                 Plaintiff,       :     Case No. 23-cv-02911 (JGK)(VF)

                                     :

             v.                   :     Hon. John G. Koeltl

                                     :

MAJOR LEAGUE SOCCER, LLC,      :

                                     :

                Defendant.    :
------------------------------------------------------x

 

**PLAINIFF'S RESPONSE IN OPPOSITION TO DEFENDANT MAJOR LEAGUE**
**SOCCER, LLC'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

<br>

SHEBAR LAW FIRM
Steven M. Shebar
Atty. 2496271 (NY)
SS-9685 (SDNY)
0N370 Fanchon St.
Wheaton, IL 60187
(630) 877-6833
steveshebar@shebarlaw.com

## <u>TABLE OF CONTENTS</u>                                                     <u>Page</u>

**<u>TABLE OF AUTHORITIES</u>** ……………………………………………………iii

**<u>INTRODUCTION</u>** …………………………………………………………......1

**<u>FACTUAL BACKGROUND</u>** …………………………………………..…..3

MLS and its Clubs' repeatedly refuse to hire or even
consider Hill in favor of less qualified non-Black candidates. ….………………………3

MLS and the MLS Clubs are merged in a single entity structure,
in which MLS reviews and approves all head coaching contracts……………..………….4

MLS relies on its single-entity structure to avoid antitrust liability. ……………………..6

MLS exercises decision-making and direct involvement in the
hiring, discipline, suspension and termination of its head coaches………………………..7

MLS has admitted the disparate impact of its enforcement
policy with regard to hiring minority head coaches. …………………………………..…7

MLS submits an incomplete, selectively redacted document in support of its motion……8

MLS Attempts to Carve Out Coaches from Single Entity Structure………………………8

**<u>ARGUMENT</u>**

**I.**       **Legal Standards** ………………………………………………………8

**II.**      **Plaintiff has amply stated a claim for violations of Title VII.** ..………………9

**III.**     **Hill has amply stated a disparate impact claim.** ………………………………10

**IV.**     **As a single entity, MLS and the MLS Clubs are equally responsible for
             the acts of employment discrimination alleged in the FAC.** ………………..12

**V.**      **MLS' single entity structure and active engagement in employment
             practices more than meets the criteria rendering it a single employer
             with its MLS Clubs.** …………………………………………………..13

            **A. Hill's allegations state a claim for Title VII and § 1981 liability against
                 MLS as a single employer with its MLS Clubs.**……………………13

            **B. MLS' single-employer authorities do not support dismissal
                 at the pleading stage.**……………………………………………… 16

**C.  MLS' other authorities are generally inapposite.** …………………………17

**CONCLUSION**…………………………………………………………………………  19

## TABLE OF AUTHORITIES

*Alie v. NYNEX Corp.*
158 F.R.D. 239 (E.D.N.Y. 1994)……………………………………………………………19

*Brady v. Nat'l Football League*
640 F.3d 785, 799 (8th Cir. 2011)………………………………………………………….6

*Brown v. Daikin Am. Inc.*
756 F.3d 219, 226–28 (2d Cir. 2014)…………………………………………………10, 14

*Brown v. Pro Football, Inc.*
518 U.S. 231, 237 (1996)……………………………………………………………………6

*Cook v. Arrowsmith Shelburne, Inc.*
69 F.3d 1235 (2d Cir. 1995)………………………………………………………………16

*Crisci-Balestra v. Civ. Serv. Emps. Ass'n, Inc.*
No. 07-CV-1684 JFB ETB, 2008 WL 413812 (E.D.N.Y. Feb. 13, 2008)…………………………17

*E.E.O.C. v. Moreland Auto Group*
LLLP, No. 11–cv–1512, 2012 WL 2974670 (D.Colo. July 20, 2012)……………………………15

*Felder v. United States Tennis Ass'n Inc.*
2018 WL 5621484 (S.D.N.Y. Oct. 30, 2018)……………………………………………….18

*Flores v. Nat'l Football League*
658 F. Supp. 3d 198, 203-04 (S.D.N.Y. 2023)……………………………………………….6

*Ford v. New York City Transit Auth.*
2001 WL 930778 (E.D.N.Y. May 31, 2001)………………………………………………..18

*Foster v. United Parcel Serv. of Am., Inc.*
No. 18-CV-10294 NSR AEK, 2023 WL 4549316 (S.D.N.Y. July 14, 2023)……………………..14

*Grant v. Bloomberg L.P.*
2013 WL 1919584 (S.D.N.Y. May 2, 2013)………………………………………………….17

*Henry v. N.Y.C. Health & Hosp. Corp.*
18 F. Supp. 3d 396, 410 (S.D.N.Y. 2014)……………………………………………….9 n.3

*Hous. Rts. Initiative v. Compass, Inc.*
No. 21-CV-2221 (SHS), 2023 WL 1993696, at *24 (S.D.N.Y. Feb. 14, 2023),
reconsid. denied, No. 21-CV-2221 (SHS), 2023 WL 2989048 (S.D.N.Y. Apr. 18, 2023)………..10

*Juhua Han v. Kuni's Corp.*
2020 WL 2614726 (S.D.N.Y. May 22, 2020)……………………………………………………18

*Karupaiyan v. CVS Health Corp.*
2021 WL 4341132  (S.D.N.Y. Sept. 23, 2021)……………………………………………………..18

*Littlejohn v. City of New York*
795 F.3d 297, 311 (2d Cir. 2015)………………………………………………………………9

*Martin v. Coinmach Corp.*
No. 15-CV-8137 (AJN)(SN), 2016 WL 6996182 (S.D.N.Y. Nov. 29, 2016)……………………11

*Mauro v. N.Y.C. Dep't of Educ.*
No. 21-2671, 2022 WL 17844438 (2d Cir. Dec. 22, 2022)……………………………………..10

*Mills-Sanchez v. Rsch. Found. for State Univ. of New York*
2019 WL 2549726, (N.D.N.Y. June 20, 2019)…………………………………………………18

*Musiello v. CBS Corp.*
518 F. Supp. 3d 782 (S.D.N.Y. 2021)……………………………………………………..16, 17 n.4

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*
296 F. Supp. 3d 442, 450 (E.D.N.Y. 2017), *aff'd*, 883 F.3d 32 (2d Cir. 2018)……………………12

*Nowak v. Major League Soccer, LLC*
14-cv-3503, 2015 U.S. Dist. LEXIS 184338 (E.D. Pa. July 20, 2015)……………………………12

Phillip Lawrence Wright, Jr., Major League Soccer: Antitrust, the Single Entity, and the Heightened Demand for a Labor Movement in the New Professional Soccer League, 10 Seton Hall J. Sport L. 358, 386 (2000)…………………………………………………………………………...6

*Rodriguez v. Town of Ramapo*
412 F. Supp. 3d 412, 439 (S.D.N.Y. 2019)……………………………………………………10, 11

*Saleh v. Pretty Girl, Inc.*
No. 09-CV-1769 ENV RER, 2012 WL 4511372 (E.D.N.Y. Sept. 28, 2012)……………………15

*St. Jean v. Orient-Express Hotels Inc.*
963 F. Supp. 2d 301, 307 (S.D.N.Y. 2013)……………………………………………2, 9, 13, 17

*Thompson v. Sanderson Farms, Inc.*
No. 04–CV–837, 2006 WL 2711497 (S.D. Miss. Sept. 21, 2006)………………………………15

*Vivenzio v. City of Syracuse*
611 F.3d 98, 106 (2d Cir. 2010)………………………………………………………………9

iv

*Vucinaj v. N.Y.C. Police Dep't*
No. 18 Civ. 7606, 2020 WL 4677597 (S.D.N.Y. Aug. 12, 2020)…………………………………9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
RICKY HILL,                                     :
                                                :
                        Plaintiff,              :        Case No. 23-cv-02911 (JGK)(VF)
                                                :
            v.                                  :        Hon. John G. Koeltl
                                                :
MAJOR LEAGUE SOCCER, LLC,                        :
                                                :
                        Defendant.              :
-------------------------------------------------------x

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT MAJOR LEAGUE SOCCER, LLC'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Plaintiff, Ricky Hill, by his undersigned counsel of record, hereby submits his Response in Opposition to Major League Soccer, LLC's ("MLS") Motion to Dismiss the First Amended Complaint ("Motion to Dismiss" or "MTD"),[1] and in support thereof states as follows:

### INTRODUCTION

MLS moves to dismiss this employment discrimination lawsuit on the asserted grounds that it had no direct involvement in, or control over, the hiring decisions of the MLS clubs identified in the First Amended Complaint ("FAC"). However, MLS time and again has judicially admitted and benefitted from its undivided league structure, calling itself a "single entity" together with its member clubs (the "MLS Clubs"). Faced with Hill's allegations of its unitary structure, MLS now tries to distance itself from the MLS Clubs to avoid having to answer for the discriminatory treatment of Hill. MLS argues that these employment decisions were made by "Team Operators," which MLS' vaguely and conclusorily calls "their own legal entities." MLS' legal about-face should be rejected, if for no other reason than its dependence upon lawyer's

---

[1] Page references to "MTD at _" are to Defendant's Memorandum of Law in Support of Its Motion to Dismiss the First Amended Complaint.

argument attempting to challenge the truth of Hill's allegations, which, together with all reasonable inferences, must be presumed true under Rule 12(b)(6). MLS winds up illuminating through its argument, however, that the purportedly independent Team Operators, admittedly responsible for hiring and entering into contracts with coaches, are actually MLS' direct owners, as members of its LLC. See Point IV, *infra*. For all relevant purposes then, specifically including the hiring of coaches, MLS and its MLS Clubs are one and the same, making the application of the common-law "single employer" designation redundant, but also irrefutable.

The single employer doctrine imposes liability on "two nominally separate entities [when they] are part of a single integrated enterprise." *St. Jean v. Orient-Express Hotels Inc.*, 963 F. Supp. 2d 301, 307 (S.D.N.Y. 2013). Therefore, even if one accepts MLS' unsupported argument that Team Operators should be viewed as separate entities from MLS, the result is the same, because the league and the MLS Clubs are undeniably part of a "single integrated enterprise," with employment decisions made by the members (i.e., owners) of Defendant Major League Soccer, LLC. See Point V, *infra*.

 Further, MLS' filing a lawyers' declaration attesting to selected excerpts of a redacted and incomplete document, and purporting to contradict Plaintiff's allegations, is not a proper basis on which to grant a motion to dismiss. As set forth above, the excerpts on which MLS relies confirm that MLS, rather than some independent entity, makes all decisions affecting employment related matters, specifically including the hiring of head coaches. At most, this submission raises questions of fact as to MLS' liability in this case, whether as a single entity or a single employer, as to which Plaintiff is entitled to discovery.

Finally, MLS asks the Court to preclude Hill from asserting the obvious and publicly-admitted disparate impact of its enforcement policy when it comes to the hiring of minority head

coach candidates. While MLS has directly intervened to suspend and determine possible reinstatement conditions for an existing head coach who made headlines for his racial slurs, it systematically and willfully blinds itself to the enforcement of its own hiring policies designed to remedy the admitted racial imbalance in its head coaching ranks. MLS has chosen a policy of delegation and non-intervention, with full knowledge that notwithstanding this disparity has persisted and flourished since at least 2007. Dismissing Hill's disparate impact theory would be contrary to the weight of Second Circuit authorities declaring that the systemic unchecked delegation of compliance with employment laws and policies, when resulting in racial disparities in hiring, is a valid basis for a disparate impact theory of harm.

**FACTUAL BACKGROUND**

**MLS and its Clubs' repeatedly refuse to hire or even
consider Hill in favor of less qualified non-Black candidates.**

As alleged in the FAC, Plaintiff Ricky Hill is an internationally acclaimed soccer player, and highly successful and decorated coach of professional men's soccer teams. FAC ¶¶2, 18-25. During the past several years, he has applied for open coaching and technical positions at the MLS Clubs identified in the FAC, each of which is wholly-owned and operated by the Defendant, MLS. *Id.* ¶¶ 2-3, 11.

In every case, after receiving inquiries from Hill, who is Black, each of the MLS Clubs hired one or more white or other non-Black candidates for those positions, each of whom was, at the time, objectively less qualified than Hill for the position. FAC ¶ 4. Despite Hill's requests for explanations as to why he had not been selected for any of the open positions, which instead went to less qualified white and other non-Black applicants, none has ever been provided by MLS, either directly or through any of the MLS Clubs.

3

**MLS and the MLS Clubs are merged in a single entity structure,
in which MLS reviews and approves all head coaching contracts.**

As Hill alleges in the FAC:

> 3. Each of the Clubs identified herein whose open positions Hill sought to apply for are owned and operated by the Defendant, Major League Soccer, LLC ("MLS").
>
> * * *
>
> 12. Instead of operating as an association of independently owned clubs, MLS is a single entity in which each team is owned by the league.
>
> 13. MLS is and has been, at all relevant times herein, an "employer," for purposes of Title VII, §1981 and all other relevant purposes herein.
>
> * * *
>
> 27. MLS is a "single-entity" league.
>
> 28. Instead of operating as an association of independently owned clubs, MLS is a single entity in which each team is owned by the league and individually operated by the league's investors.
>
> 29. MLS' component clubs are not individual businesses, but simply part of the larger MLS business. The league owns the Clubs and their contracts and controls all league business, from TV deals, to jersey sponsorships, to employment contracts.
>
> * * *
>
> 31. [The MLS Constitution provides as follows:] Upon the opening or creation of any position involving a technical director, head, assistant or youth coach, the Team Operator's General Manager must notify the League Office. Upon notification, the Team Operator shall interview at least one (1) minority candidate for such available position. Each Team Operator must provide the League Office with information related to the minority candidates interviewed and considered for the available position. If the Team Operator does not adhere to these guidelines, the Commissioner shall have the authority to impose sanctions in the Commissioner's sole discretion.
>
> 32. Upon information and belief, neither the MLS nor any of the Clubs complied with the above-described Diversity Initiative, which specifically applies to head coach positions, with respect to Mr. Hill's candidacies.
>
> 33. Upon information and belief, no Club was sanctioned by MLS for failing to adhere to the guideline of interviewing at least one minority candidate for the available head coach positions sought by Hill.
>
> 34. The [MLS] Constitution further provides: * * * Each Team Operator must file each employment contract with the MLS legal department within three (3) business days of the execution of such contract for MLS's review and approval with respect to compliance with any applicable League Rules.
>
> * * *
>
> 44. As MLS' own assessments and amendments to hiring policies and procedures that are binding on its clubs make clear, MLS both participates

in and controls the clubs' hiring practices, specifically including those governing the hiring of people of color in head coach positions.

45. In addition, MLS recently demonstrated its power to suspend, fine and reinstate head coaches in its league in the case of Bruce Arena.

46. Arena, as head coach of New England Revolution, was suspended indefinitely in August of 2023 for "insensitive remarks." To be considered for reinstatement four months later, he was required to petition League Commissioner Don Garber.

MLS' necessary approval of the non-Black hire in each case that Hill was rejected constitutes MLS' direct involvement in the discriminatory act. Moreover, based on its Constitution (as quoted above), MLS would have been notified of the minority candidate interviewed in each case, so MLS likely would have knowingly rejected Hill. MLS has never denied this plausible inference, which Hill should be able to explore in discovery.

In addition, MLS confirms in its Motion to Dismiss that the hiring of coaches is carried out by MLS' member-owners. MLS attaches selected, redacted portions of its Constitution to the Declaration of Elise M. Bloom, filed with its Motion to Dismiss ("Bloom Dec."), including Section 12, which Plaintiff also incorporated into his FAC (at paragraph 34). This provision makes clear that the Team Operators, which MLS admits are responsible for hiring coaches, are actually the members, *i.e.*, owners of the LLC that is MLS. Bloom Dec., Ex. A at 4 ("All Owners . . . of MLS and of each Member (including each Team Operator) are subject to and must comply with all League Rules.") This is a clear admission that the Team Operators, claimed by MLS to be "their own legal entities," are, in fact, the very entities that own MLS.

MLS points the Court to the Bloom Declaration, Exhibit A, page 2, as support for its assertion that Team Operators are "their own legal entities." MTD at 13. However, neither that page, nor anything else in the Bloom Declaration or Exhibit A says anything about the Team Operators being "their own legal entities." Indeed, based on MLS' own admitted structure, set forth in the FAC and consistently reported publicly in reliable media (see Point IV, *infra*), MLS,

i.e., Major League Soccer, LLC, owns its MLS Clubs outright. Each Team Operator is actually an investor in, and member of, the LLC that is MLS. FAC ¶ 34. The members of an LLC are its owners. See https://www.irs.gov/businesses (Owners of an LLC are its members).

### MLS relies on its single-entity structure to avoid antitrust liability.

It is well-known through MLS' admissions in and out of court that its single-entity structure allows MLS to avoid antitrust violations that could otherwise result from anti-competitive agreements and other concerted action, among truly separate teams, to fix or limit salaries, benefits, lengths of contracts, etc. See Point IV, *infra*.

This distinguishes MLS from, for example, the National Football League ("NFL"), in which the league is an association created by the independently-owned teams. *See, e.g., Flores v. Nat'l Football League*, 658 F. Supp. 3d 198, 203-04 (S.D.N.Y. 2023) ("The NFL is an unincorporated association of thirty-two professional football clubs. . . . [E]ach club is a separate legal entity[.]") The NFL avoids antitrust liability through the collective bargaining process with its players' union, creating a "non-statutory exemption" to the antitrust laws. *See Brown v. Pro Football, Inc*., 518 U.S. 231, 237 (1996).

Failing MLS' organization as a bona fide single entity with its MLS Clubs, it would have to restructure its operations to include a similar exemption from antitrust liability. *See Brady v. Nat'l Football League,* 640 F.3d 785, 799 (8th Cir. 2011) ("when a union decertifies, the collective bargaining relationship between the players and owners (or league) ends because the union no longer represents the players and the players regain the ability to sue under the Sherman Act." *Citing* Phillip Lawrence Wright, Jr., Major League Soccer: Antitrust, the Single Entity, and the Heightened Demand for a Labor Movement in the New Professional Soccer League, 10 Seton Hall J. Sport L. 358, 386 (2000).

**MLS exercises decision-making and direct involvement in the
hiring, discipline, suspension and termination of its head coaches.**

In his FAC, Hill alleges in detail how the MLS (i) has recognized since 2007 that its MLS Clubs have failed to attain proportionate representation of Black head coaches and (ii) has publicized several different policies and initiatives, binding on its MLS Clubs, purportedly undertaken to correct historical racial inequity and imbalance in the failure to hire Black head coaches. FAC ¶¶36-43. Hill then makes the following allegations:

> 44. As MLS' own assessments and amendments to hiring policies and procedures that are binding on its clubs make clear, MLS both participates in and controls the clubs' hiring practices, specifically including those governing the hiring of people of color in head coach positions.
> 45. In addition, MLS recently demonstrated its power to suspend, fine and reinstate head coaches in its league in the case of Bruce Arena.
> 46. Arena, as head coach of New England Revolution, was suspended indefinitely in August of 2023 for "insensitive remarks." To be considered for reinstatement four months later, he was required to petition League Commissioner Don Garber.

FAC ¶¶ 44-46.

The foregoing facts demonstrate the MLS' active involvement and ability to control the hiring practices and implementation of decisions affecting both the hiring, discipline, suspension and termination head coaches.

**MLS has admitted the disparate impact of its enforcement
policy with regard to hiring minority head coaches.**

Hill's FAC spells out in detail the racial disparities, particularly with regard to the hiring of Black head coaches, that MLS has been acknowledging and, at least publicly, pledging to remedy since at least 2007. FAC ¶¶ 36-44. Further, Hill alleges that MLS' facially-neutral policy of delegation and non-enforcement of policies governing the hiring of head coaches, despite its power to do so, has had the above-described disparate impact. *Id.* ¶¶45-46, 114-115 (suspending head

coach Bruce Arena for racially-insensitive remarks, while systematically ignoring violations of its own hiring policies to remedy discriminatory disparities).

### MLS submits an incomplete, selectively redacted document in support of its motion.

The excerpts MLS submits from its Constitution are incomplete and redacted. Bloom Dec., Ex. A. To the extent MLS has permitted Plaintiff and the Court to see it, it says nothing that refutes Hills's allegations in the FAC that MLS owns and operates the MLS Clubs as a single entity. Even by its selective reference to its Constitution, MLS has failed to point to any contrary fact that would allow MLS to also escape liability for the MLS Clubs' employment discrimination on the basis that "each club is its own legal entity."

### MLS Attempts to Carve Out Coaches from Single Entity Structure.

MLS also tries to avoid Hill's claims by arguing that coaches' employment applications should be treated differently than other hires, such as players, because their contracts purportedly are with the MLS Clubs. MTD at 6-7.[2] Even if MLS were to offer specific evidence to support this contention, such as examples of such contracts, the names, positions and employment status of specific persons who considered Hill and/or other prospective coaches for head coach positions in MLS, the result would be the same. This is because MLS admits that the hiring and contracting of head coaches is done by "Team Operators," which are, at most, nominally separate entities that are members and owners of the LLC that is MLS.

### ARGUMENT

### I.    Legal Standards

---

[2] MLS goes so far as to threaten to seek sanctions against Hill for arguing that coaches are hired by MLS, because of unsourced dicta in *Fraser,* a 2002 case explaining that coaches, unlike players, are hired by Team Operators. MTD at 2, n.1. However, as previously and further explained, this nominal distinction does not permit MLS to avoid liability.

Under Second Circuit law,

> In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.
>
> To survive dismissal, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Plaintiffs must allege sufficient facts to nudge their claims across the line from conceivable to plausible. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Though the court must accept the factual allegations of a complaint as true, it is not bound to accept as true a legal conclusion couched as a factual allegation.

*St. Jean v. Orient-Express Hotels Inc.*, 963 F. Supp. 2d 301, 306 (S.D.N.Y. 2013) (citations and internal quotation marks omitted) (denying motion to dismiss employment discrimination claims based on U.S. company's claim of separateness from its foreign affiliate).

## II.    Plaintiff has amply stated a claim for violations of Title VII.

To adequately plead a claim for discriminatory failure to hire under Title VII, Hill is required to plausibly allege that (1) he is a member of a protected class, (2) he was qualified for the job for which he applied, (3) he was denied the job, and (4) the denial occurred under circumstances that give rise to an inference of invidious discrimination. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). The facts alleged "need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015); *accord Vucinaj v. N.Y.C. Police Dep't,* No. 18 Civ. 7606, 2020 WL 4677597, at *6 (S.D.N.Y. Aug. 12, 2020).[3]

---

[3] As MLS acknowledges, on a motion to dismiss, "Section 1981 discrimination claims are analyzed under the same substantive standard applicable to Title VII discrimination claims." MTD at 9, n.8, *citing Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 410 (S.D.N.Y. 2014).

Moreover,

> A plaintiff may show discriminatory animus by alleging that she was treated
> less well than others who were similarly situated, and at the pleading stage
> must allege facts that at least raise the minimal inference that the defendants'
> conduct was discriminatory.

*Mauro v. N.Y.C. Dep't of Educ.,* No. 21-2671, 2022 WL 17844438, at *2 (2d Cir. Dec. 22, 2022)

(summary order); *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014).

Hill's FAC alleges each of the required elements in factual detail. *See* FAC ¶ 1 (protected

class);  ¶¶18-26  (Hill's qualifications as a professional soccer head coach); ¶¶47-66 (Hill applied

for head coach position at MLS club Atlanta United FC, was more qualified than the white

candidate selected over Hill); ¶¶67-91 (Hill applied for head coach position at MLS club Inter-

Miami FC, was more qualified than the white candidate selected over Hill); ¶¶92-103 (Hill applied

for head coach position at MLS club Charlotte FC, was more qualified than the white candidate

selected over Hill).

**III.**     **Hill has amply stated a disparate impact claim.**

"Plaintiffs are merely required to plausibly plead disparate impact; they are not required to

prove causation or disparate impact through statistical evidence at the pleading stage." *Hous. Rts.*

*Initiative v. Compass, Inc.*, No. 21-CV-2221 (SHS), 2023 WL 1993696, at *24 (S.D.N.Y. Feb. 14,

2023), reconsideration denied, No. 21-CV-2221 (SHS), 2023 WL 2989048 (S.D.N.Y. Apr. 18,

2023) (citations omitted). Hill's Complaint contains ample allegations to support relief under Title

VII on a disparate impact theory:

> To make out a prima facie disparate impact case, a plaintiff therefore must
> (1) identify a specific employment practice or policy; (2) demonstrate that
> a disparity exists; and (3) establish a causal relationship between the two.

*Rodriguez v. Town of Ramapo*, 412 F. Supp. 3d 412, 439 (S.D.N.Y. 2019) (citations omitted).

In *Martin v. Coinmach Corp.*, No. 15-CV-8137 (AJN)(SN), 2016 WL 6996182, at *5 (S.D.N.Y. Nov. 29, 2016), the court noted that:

> The Supreme Court has held that disparate impact analysis is in principle no less applicable to subjective employment criteria than to objective or standardized tests. In either case, a facially neutral practice, adopted without discriminatory intent, may have effects that are indistinguishable from intentionally discriminatory practices. Accordingly, in appropriate cases, giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory—because an employer's undisciplined system of subjective decision making can have precisely the same effects as a system pervaded by impermissible intentional discrimination.

*Id.* (citations and internal quotations omitted). *See also Rodriguez*, 412 F. Supp. 3d at 439 (absence of any established objective criteria for a certain employment decisions and reliance on unchecked discretion of a supervisor can serve as the facially-neutral specific employment practice or policy); *McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 907 (N.D. Ill. 2011) (finding disparate impact claim stated where the complaint identified policy of giving certain supervisors "unchecked discretion").

Hill alleges in his FAC that MLS has been developing and revising hiring policies designed to remedy the inequitable underrepresentation of Blacks among its head coaching ranks for over 15 years. FAC ¶¶36-44. MLS has announced publicly, and included in its Constitution, its centralized control and ability to enforce these policies, including fines for MLS Clubs for failure to comply. *Id.* ¶ 31. However, in practice, as alleged in the FAC, MLS policy has apparently been one of unsupervised delegation to MLS Club-level management of its remedial, anti-discriminatory head-coach hiring policies (FAC ¶¶ 32-33), resulting in systemic non-enforcement, with discriminatory results. Accordingly, Hill has adequately pled the basis for a disparate impact claim under *Martin* and *Rodriguez*.

**IV.**     **As a single entity, MLS and the MLS Clubs are equally responsible for the acts of employment discrimination alleged in the FAC.**

Hill has alleged in detail in the FAC that MLS (an LLC) and the MLS Clubs comprise a single entity in which all teams are owned by the league, and operated by MLS' investors, who are the owners of the LLC. MLS' component clubs are not individual businesses, but simply part of the larger MLS business. The league owns the Clubs and their contracts and controls all league business, from TV deals, to jersey sponsorships, to employment contracts.

Moreover, Plaintiff's allegations as to MLS' single-entity, unified and self-contained structure are consistently established as facts in reported decisions, as well as credible third-party media sources. *See, e.g.*, *Nowak v. Major League Soccer, LLC,* 14-cv-3503, 2015 U.S. Dist. LEXIS 184338, at *1-2 (E.D. Pa. July 20, 2015) ("Each team within the MLS is owned by MLS but is operated by an owner-operator that is a member of MLS."); *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.,* 296 F. Supp. 3d 442, 450 (E.D.N.Y. 2017), *aff'd*, 883 F.3d 32 (2d Cir. 2018) ("MLS began play under a single-entity structure, reserving ownership and management power in the league itself."); https://lexsportiva.blog/2019/10/09/mls/ (MLS "centrally owns all the teams and player contracts. . . . MLS also controls the revenues and expenses of the league and its teams, with all revenue generated by the league belonging directly to the MLS. Similar to investors receiving dividends in a limited liability company, the MLS will then distribute profits (or losses) to its investors / team 'owners.' . . . Furthermore, the MLS pays salaries for league personnel (such as referees), travel expenses and insurance, amongst others."); https://www.conductdetrimental.com/post/mls-single-entity-structure-is-an-antitrust-nullity ("The legal entity which operates each individual club is a member of MLS. Thus, when people talk about MLS being a "single-entity," the entity to which they are referring is "Major League Soccer, LLC.").

In addition, MLS' (i) acknowledgment of a league-wide failure to remedy historical racial imbalances and underrepresentation of Blacks in positions of leadership including as head coaches, (ii) publicly-announced implementation of hiring policies and initiatives binding on its MLS Clubs, (iii) actual involvement in the discipline, suspension and reinstatement of head coaches and (iv) MLS' review and approval of all contracts (including those of head coaches), remove any doubt that MLS exercises unilateral control over both the employment policies of its MLS Clubs, as well as their specific employment practices relating to hiring, suspending and reinstating head coaches.

Arguably, the absence of separation between MLS and the MLS Clubs is so complete that it obviates reliance on the single employer doctrine, which is applied "when two nominally separate entities are part of a single integrated enterprise." *St. Jean*, 963 F. Supp. 2d at 307. As set forth below, however, taking into account the salutary goal of holding companies that make employment decisions and hiring policies, and exercise control over their enforcement by nominally separate entities, MLS is certainly a proper defendant in this lawsuit as a single employer.

**V.    MLS' single entity structure and active engagement in employment practices more than meets the criteria rendering it a single employer with its MLS Clubs.**

**A.   Hill's allegations state a claim for Title VII and § 1981 liability against MLS as a single employer with its MLS Clubs.**

Specifically with regard to pleading a "single employer" theory of liability,

> In the context of a motion to dismiss, a plaintiff need only allege facts sufficient to put the defendant on notice of the theory of employer liability upon which [his or] her claims are based. And although the determination of whether two related entities are sufficiently integrated to be treated as a single employer is generally a question of fact, where a plaintiff's allegations are so inadequate that they fail to put a defendant on notice of the theory of employer liability, dismissal is appropriate.

*Foster v. United Parcel Serv. of Am., Inc.*, No. 18-CV-10294 NSR AEK, 2023 WL 4549316, at *5 (S.D.N.Y. July 14, 2023) (citations and internal quotation marks omitted).

Plaintiff has plausibly alleged a legally-cognizable theory of liability for employment discrimination against MLS, and done so in a way that goes well beyond putting MLS on notice of his theory of liability. The basis for treating MLS as a single employer is explained in *Brown v. Daikin Am. Inc.,* 756 F.3d 219, 226–28 (2d Cir. 2014):

> To prevail in an employment action against a defendant who is not the plaintiff's direct employer, the plaintiff must establish that the defendant is part of an 'integrated enterprise' with the employer, thus making one liable for the illegal acts of the other. . .. ***Whether two related entities are sufficiently integrated to be treated as a single employer is generally a question of fact not suitable to resolution on a motion to dismiss***.

*Id.* (emphasis supplied) (citations omitted).

The Brown court went on to identify a four-factor test to make the determination:

> Under this test, a parent and subsidiary cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. Although no one factor is determinative ... control of labor relations is the central concern.

*Id.*

Significantly,

> To satisfy the single-employer test, a plaintiff need not allege that the parent exercises "total control or ultimate authority over hiring decisions," so long as he alleges that there is "an amount of participation [by the parent] that is sufficient and necessary to the total employment process."

*Id.*

Further, "[a]lthough the Second Circuit has noted that the critical question is what entity made the final decisions regarding employment matters related to the person claiming discrimination[,] no one factor is determinative[.] Whether related entities qualify as a single

14

employer is an issue of fact. *Saleh v. Pretty Girl, Inc*., No. 09-CV-1769 ENV RER, 2012 WL 4511372, at *9 (E.D.N.Y. Sept. 28, 2012) (citations and internal quotation marks omitted); *see also Levine v. Reader's Dig. Ass'n, Inc.*, 347 F. App'x 602, 604 (2d Cir. 2009) (rejecting challenge on appeal to jury instructions in single employer case where instructions "did not encourage the jury to place undue weight on any one factor, such as what entity made the final termination decision, because the court advised that '[n]o one factor is determinative' in order to find joint liability.")

Particularly pertinent to MLS' arguments for dismissal, "[a] single-employer determination is "powerfully suggest[ed]" where one nominally separate entity "exercised centralized control over harassment policies and complaints involving [the subordinate entity's] employees and those of the other [subordinate entities]." 2012 WL 4511372 at *11. The court in *Saleh* found the centralized control of these policies and their enforcement to be "more critical" than direct or face-to-face participation in the making or carrying out of an employment decision. *Id., citing E.E.O.C. v. Moreland Auto Group*, LLLP, No. 11–cv–1512, 2012 WL 2974670 (D.Colo. July 20, 2012) (denying summary judgment in retaliatory termination suit where, inter alia, one employee prepared identical handbooks for all related entities and was the contact person for sexual harassment claims, and owner of related entities had authority over personnel decisions even though neither he nor the two entities at issue were involved in plaintiff's termination); *Thompson v. Sanderson Farms, Inc*., No. 04–CV–837, 2006 WL 2711497 (S.D. Miss. Sept. 21, 2006) (denying summary judgment in suit alleging disparate treatment where, inter alia, each entity had its own human resources manager but their decisions had to comply with centralized employment policies and parent company was responsible for making final disciplinary decisions concerning violations of harassment policies) (parentheticals quoted from *Saleh*).

Hill's allegations of MLS' centralized control of employment policy and labor relations, its necessary involvement in approving the non-Black hire in each case Hill was rejected, its actual participation in its head coaches' employment determinations (i.e. Bruce Arena), its required review and approval of all coaches' contracts, and the complete integration of operations by virtue of the Team Operators ownership of the MLS LLC, establish that Hill has plausibly alleged more than the threshold "sufficient and necessary" participation in the employment process to hold MLS responsible as a single employer.

**B.   MLS' single-employer authorities do not support dismissal at the pleading stage.**

With regard to the single employer doctrine, MLS relies on *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235 (2d Cir. 1995) (MTD at 14), which found *at the summary judgment stage*, the parent *should not be* dismissed because of its potential status as a single employer with its subsidiary. *Id*. at 1241. In support of its decision, the *Cook* court included many of the factors alleged to be present in the instant case, even without the benefit of discovery, including (i) the subsidiary being wholly-owned; (ii) operations being substantially interrelated; (iii) the parent establishing operational and management practices of the subsidiary; and (iv) employment decisions being approved by the parent. *Id.*

*Musiello v. CBS Corp.,* 518 F. Supp. 3d 782 (S.D.N.Y. 2021), also cited on this issue (MTD at 16) is distinguishable factually from the case at bar, because unlike the class action plaintiffs in that case, Hill has not only plausibly alleged MLS' centralized, league-wide control over labor and employment functions, but has also demonstrated, without the benefit of discovery, that MLS is necessarily directly involved in deciding to approve the contracts of specific head coaches, including whatever non-Black coach was hired instead of Hill. In addition, (i) the CBS subsidiary directly responsible for employment decisions in *Musiello* was not a member-owner of the parent

company (as the MLS Clubs are of MLS) and (ii) CBS, the parent, did not impose specific anti-discrimination policies specifically for its subsidiaries, take responsibility for enforcing them, and then systematically fail to do so, as MLS did in Ricky Hill's case.[4]

Even taking Hill's allegations in their *least favorable* light, the result here should follow *St. Jean*, 963 F. Supp. 2d at 309–10, where the court, after reviewing salient authorities making single-employer determinations after discovery or on appeal after a trial, ruled that:

> While the entities may have a common corporate parent, this fact, standing alone, is insufficient to establish that the OEHI and Cupecoy are a single employer. However, at this stage of the litigation, additional facts may be obtained through discovery and it is inappropriate to dismiss the claims on this basis.
>
> Taken together, Plaintiff has presented facts that, if true, plausibly demonstrate that Cupecoy may be controlled by OEHI, and that the entities may act as a single employer. As discussed above, as the litigation advances, Defendant may demonstrate that Cupecoy is not a foreign corporation "controlled" by OEHI, the American employer. Plaintiff, however, has pled sufficient facts for the purposes of the instant motion. The motion to dismiss is therefore inappropriate on these grounds.

*Id.* at 310.

### C.  MLS' other authorities are generally inapposite.

The other cases MLS cites do not involve facts analogous to the most central facts of Hill's case against MLS, *i.e.*, those establishing MLS as a single entity and single employer. See Points IV and V, *supra*. *See Crisci-Balestra v. Civ. Serv. Emps. Ass'n, Inc.,* No. 07-CV-1684 JFB ETB, 2008 WL 413812, at *6 (E.D.N.Y. Feb. 13, 2008) (plaintiff's allegations were "unintelligible," asserting only that she was hired "through" the defendant); *Grant v. Bloomberg L.P.,* 2013 WL

---

[4] Frankly, the decision in *Musiello* seems to depart from its own recognition that, "at the pleading stage, a complaint need not plead that the parent exercises 'total control' over hiring decisions . . . as long as it pleads facts supporting a reasonable inference that there is 'an amount of participation [by the parent] that is sufficient and necessary to the total employment process.' 518 F. Supp. at 789-90.

1919584, at *1 (S.D.N.Y. May 2, 2013) (dismissal had nothing to do with defendant's status as separate entity, but was based on plaintiff's "fail[ure] to allege that the defendant's decision not to offer him the position was in any way connected to his race."); *Felder v. United States Tennis Ass'n Inc.,* 2018 WL 5621484, at *3 (S.D.N.Y. Oct. 30, 2018) (allegation that third-party entity unsuccessfully sought to place plaintiff in a job at USTA's event, was not an application by plaintiff for a job with defendant); *Karupaiyan v. CVS Health Corp.*, 2021 WL 4341132, at *28 (S.D.N.Y. Sept. 23, 2021) (unlike Hill's Complaint, which provides details of every open head coaching position for which Hill sought to be considered, and the identities of candidates who got the job instead of Hill, plaintiff's complaint here was "devoid of any facts suggesting that he actually applied for any open position, whether formally or informally. Plaintiff does not even allege whether such a position was in fact available."); *Mills-Sanchez v. Rsch. Found. for State Univ. of New York,* 2019 WL 2549726, at *8 (N.D.N.Y. June 20, 2019) (unlike Hill's allegations of MLS' control and authority over hiring decisions and practices, this plaintiff's "Amended Complaint does not allege that RFMH is affiliated with RF SUNY, or that RF SUNY had any control or authority over [its] hiring decisions."); *Ford v. New York City Transit Auth.*, 2001 WL 930778, at *7 (E.D.N.Y. May 31, 2001) (unlike Hill's extensive factual refutation of MLS' claim not to participate in its clubs' employment decisions, "Defendants assert, and Plaintiff does not refute, that Defendants did not participate in any MTA employment decisions."); *Juhua Han v. Kuni's Corp.*, 2020 WL 2614726, at *11 (S.D.N.Y. May 22, 2020) (Hill's complaint makes specific factual assertions about MLS' control over the hiring decisions that affected him and he has further apprised the court in this response of specific facts about MLS' organizational structure that will support a single-employer claim, which is contrary to plaintiff's complaint here, which "contains no factual allegations demonstrating that PFS, as opposed to Kuni's, controlled Plaintiff's

employment or engaged in the employment decisions that Plaintiff challenges."); *Alie v. NYNEX Corp.*, 158 F.R.D. 239, 245-46 (E.D.N.Y. 1994) (unlike Hill's allegations supporting a single-employer claim, "[t]he plaintiff has alleged only that Telesector Resources Group, Inc. and NYNEX Corporation have a substantial identity of interest for purposes of Title VII.")

Accordingly, MLS has cited no case mandating dismissal of Hill's claims.

## **CONCLUSION**

For all of the foregoing reasons, Plaintiff respectfully requests that the Court enter an order (i) denying the Motion to Dismiss in its entirety; or (ii) to the extent the Court grants the Motion to Dismiss, that it does so without prejudice and granting Plaintiff leave to file an amended complaint; and (iii) granting Plaintiff such other and further relief as the Court deems just and proper.

Respectfully submitted,

RICKY HILL

By: /s/Steven M. Shebar
        One of His Attorneys

SHEBAR LAW FIRM
Steven M. Shebar
Atty. 2496271 (NY)
SS-9685 (SDNY)
0N370 Fanchon St.
Wheaton, IL 60187
(630) 877-6833
steveshebar@shebarlaw.com

## <u>CERTIFICATION</u>

I, Steven M. Shebar, attorney for Plaintiff herein, certify that the foregoing PLAINIFF'S RESPONSE IN OPPOSITION TO DEFENDANT MAJOR LEAGUE SOCCER, LLC'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT, exclusive of the cover, table of contents and table of authorities, is 6,051 words in length, according to the "word count" feature on Microsoft Word.


<u>/s/Steven M. Shebar</u>